IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| KEVEN L. CARTER, R25659 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 04-1157 |
| | ) | |
| ERIKA R. HOWARD, CLIFFORD VELLA, | ) | |
| RICHARD ALLEN, DOUGLAS CRAVENS, | ) | |
| ROGER E. WALKER JR., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

NOW COME the Defendants, ROGER E. WALKER JR., ERIKA HOWARD, JENNIFER MELVIN, and CLIFFORD VELA, by and through their attorney, Lisa Madigan, Attorney General of the State of Illinois, and in support of their Motion for Summary Judgment, hereby submit the following Memorandum of Law:

**INTRODUCTION**

Plaintiff is an inmate currently incarcerated at Pinckneyville Correctional Center. Plaintiff filed his Complaint pursuant to 42 U.S.C. § 1983, alleging a violation of the First Amendment right to free exercise of his religious beliefs. Specifically, Plaintiff complains of the denial of religious services while he was in segregation at Pontiac Correctional Center. Plaintiff was placed in segregation status as a result of disciplinary reports he received on December 26, 2003. He was found guilty by a prison Adjustment Committee of the disciplinary charges, and the disciplinary sanctions imposed included a total of five months in segregation. During Plaintiff's stay in segregation status from December 26, 2003, to May 26, 2004, he was not permitted to attend communal religious services.

Plaintiff seeks damages against Defendants for his inability to participate in religious services from December 26, 2003, to May 26, 2004.

## UNDISPUTED MATERIAL FACTS

1.	Plaintiff is an inmate with the Illinois Department of Corrections, currently incarcerated at Pinckneyville Correctional Center.  Defendants' Exhibit 1, Deposition of Keven Carter ("Dep."), taken August 30, 2006, at 4, lines 15-25.

2.	Plaintiff does not associate with a specific denomination, but characterizes his religious beliefs as Christian.  Defendants' Exhibit 1, Dep. at 5, lines 1-25.

3.	Pontiac Correctional Center is a maximum security facility for adult male felons.  Defendants' Exhibit 2, affidavit of Troy Quinley.

4.	Offenders housed at Pontiac Correctional Center are assigned to either disciplinary segregation status or protective custody status.  Defendants' Exhibit 2, affidavit of Troy Quinley.

5.	While incarcerated at Pontiac Correctional Center, Plaintiff received two separate disciplinary reports on December 26, 2003, charging him with prison disciplinary infractions.  Defendants' Exhibit 1, Dep. at 13, lines 15-25; at 14, lines 1-9; see also Defendants' Exhibit 3.

6.	One disciplinary report charged Plaintiff with damage or misuse of property and violation of rules.  See Defendants' Exhibit 3.

7.	The other disciplinary report charged Plaintiff with disobeying a direct order.  See Defendants' Exhibit 3.

8.	Plaintiff was found guilty of the charges and the disciplinary measures imposed included 3 months in segregation and 2 months in segregation, respectively.  Defendants' Exhibit 3; see also Defendants' Exhibit 1 at 15.

9. Plaintiff was in disciplinary segregation status at Pontiac Correctional Center from December 26, 2003, until May 26, 2004. Defendants' Exhibit 1, Dep. at 5, lines 13-21.

10. Inmates in disciplinary segregation status at Pontiac Correctional Center were not permitted to attend communal activities such as meals, recreational yard time, library services, and religious services during the time period of December 2003 to May 2004, and are not currently permitted to engage in these activities. Defendants' Exhibit 2, affidavit of Troy Quinley.

11. Inmates in disciplinary segregation status at Pontiac Correctional Center have been assigned there for disciplinary reasons based on behavior including assault, fighting, sexual misconduct, possession of contraband, and threats and intimidation. Defendants' Exhibit 2, affidavit of Troy Quinley.

12. One of the reasons communal activities are not permitted for disciplinary segregation status offenders is based upon the potential danger to staff and other offenders posed by allowing offenders with demonstrated disciplinary issues to congregate, possibly with the same offenders with whom the original disciplinary offenses occurred. Defendants' Exhibit 2, affidavit of Troy Quinley.

13. Communal services also present a potential security concern because of the opportunity for gang-related activity. Defendants' Exhibit 2, affidavit of Troy Quinley.

14. Plaintiff was not permitted to attend communal religious services while in disciplinary segregation from December 26, 2003, until May 26, 2004. Defendants' Exhibit 1, Dep. at 26, lines 2-7.

15. While Plaintiff did not have access to religious services from December 26,

2003, to May 26, 2004, Plaintiff had access to the prison chaplain, Chaplain Kennell. Defendants' Exhibit 1, Dep. at 26, lines 2-10.

16.     Inmates in segregation status are provided with the opportunity for individual religious counseling, by meeting with a chaplain, imam, rabbi, or other religious volunteer. Defendants' Exhibit 4, affidavit of Eldon Kennell; see also Defendants' Exhibit 1, Dep. at 21, lines 1-23.

17.     According to Chaplain Kennell, who has served as chaplain at Pontiac Correctional Center since 1988, the segregation living units are toured at least once per week by religious personnel who will talk with offenders and provide religious materials. Defendants' Exhibit 4, affidavit of Eldon Kennell.

18.     Plaintiff acknowledges that Chaplain Kennell came by his cell while he was in segregation.  Defendants' Exhibit 1, Dep. at 26, lines 2-10.

19.     While in segregation, Plaintiff could pray in his cell and over his meals. Defendants' Exhibit 1, Dep. at 16, lines 21-25; at 17, line 1.

20.     Plaintiff was permitted to have religious materials in his cell while in segregation; for example, Plaintiff was able to read the Bible and religious publications including "The Daily Bread" and a daily prayer manual from the Gideons.  Defendants' Exhibit 1, Dep. at 17, lines 2-15; at 19, lines 8-18; at 20, lines 8-15.

21.     Defendant Howard served as Chairperson of the Adjustment Committee that found Plaintiff guilty on the December 26, 2003, disciplinary reports.  Defendants' Exhibit 1, Dep. at 32, lines 1-24; see also Defendants' Exhibit 3.

22.     Defendant Vela served on the Adjustment Committee that recommended disciplinary action of three months in segregation. Defendants' Exhibit 1, Dep. at 34, lines 1-6; see also Defendants' Exhibit 3.

4

23.     Plaintiff had no further interaction with Defendant Howard or Defendant Vela after he was found guilty of the disciplinary reports and placed in segregation. Defendants' Exhibit 1, Dep. at 36, lines 1-4.

24.     Defendant Walker is the Director of the Illinois Department of Corrections. Defendants' Exhibit 1, Dep. at 28, lines 9-16.

25.     Defendant Melvin served as the Grievance Officer who reviewed a grievance filed by Plaintiff concerning the disciplinary reports and mentioning his inability to attend religious services. Defendants' Exhibit 1, Dep. at 30, lines 18-25; at 31, lines 1-7.

## ARGUMENT

### Standard for Summary Judgment

Summary judgment is proper where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c). Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If a rational trier of fact could not find for the non-moving party, then summary judgment should be granted. Rogers v. City of Chicago, 320 F.3d 748, 752 (7th Cir. 2003). When determining whether a genuine issue of material fact exists, irrelevant or immaterial facts are disregarded, as "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). At the summary judgment stage, "the question is not what the pleadings say but what the evidence shows." Taylor v. U.S., 287 F.3d 658, 661 (7th Cir. 2002).

I. **LEGITIMATE PENOLOGICAL INTERESTS EXIST FOR NOT PERMITTING SEGREGATION INMATES TO ATTEND COMMUNAL ACTIVITIES AND PLAINTIFF HAD ALTERNATIVE MEANS OF EXERCISING HIS BELIEFS**

To receive First Amendment protection, a plaintiff's claim must be "rooted in religious belief." Wisconsin v. Yoder, 406 U.S. 205, 215 (1972). While prisoners retain First Amendment rights, including free exercise of religion, while incarcerated, such rights must coexist with the demands of prison discipline and legitimate institutional objectives. Williams v. Lane, 851 F.2d 867, 877 (7th Cir. 1988). A prisoner's right to exercise his religious beliefs is balanced against the legitimate goals of the institution. Hadi v. Horn, 830 F.2d 779, 783 (7th Cir. 1987). An inmate is not entitled to practice every aspect of his religion. Tarpley v. Allen County, Indiana, 312 F.3d 895, 898 (7th Cir. 2002). With respect to First Amendment rights generally, inmates retain those First Amendment rights "consistent with prison discipline." Ustrak v. Fairman, 781 F.2d 573, 580 (7th Cir. 1986).

The United States Supreme Court has established that prison regulations that allegedly violate an inmate's constitutional rights are judged under a less restrictive test than that typically applied to alleged infringements of fundamental constitutional rights. O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987). In O'Lone, Muslim inmates who were assigned to outside work detail were unable to participate in Jumu'ah due to prison policy that prohibited inmates working outside the institution from returning to the institution during the day. The United States Supreme Court found no First Amendment violation in these circumstances, noting that incarceration necessarily entails limitations on constitutional rights ' "arising both from the fact of incarceration and from valid penological objectives - including deterrence of crime, rehabilitation of prisoners, and institutional security.'" Id. at 348, citing Pell v. Procunier, 417 U.S. 817, 822-23 (1974); Procunier v. Martinez, 416 U.S. 396, 412 (1974).

Accordingly, restrictions that infringe upon an inmate's exercise of religion will be upheld if they are "reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89 (1987). Relevant factors include: (1) whether a valid, rational connection exists between the regulation and a legitimate government interest, (2) whether there are other means of exercising the right in question for prisoners, (3) the impact accommodating the claimed right would have on guards, other inmates, and prison resources, and (4) the availability of obvious and easy alternatives to the regulation. Id. at 89-90. Prisons have a legitimate penological interest in maintaining security. Tarpley, 312 F.3d at 898; Al-Alamin v. Gramley, 926 F.2d 680, 686 (7th Cir. 1991). The inmate has the burden of disproving the validity of a challenged prison regulation. Overton v. Bazzetta, 539 U.S. 126, 132 (2003). With respect to religious practices while confined in segregation, Illinois inmates are given the opportunity to see a chaplain once per week. 20 Ill. Admin. Code § 504.620(m) (2006).

As a general principle, federal courts afford deference to the decisions of prison administrators. Turner, 482 U.S. at 85. While the Seventh Circuit has previously found that the denial of communal religious services and religious counseling and instruction constitutes a First Amendment violation, this was in circumstances where the inmates were in protective custody for their own safety and the rationale advanced was that communal services would burden the staff and programs in protective custody. Williams v. Lane, 851 F.2d 867, 877-78 (1988). Subsequent Seventh Circuit opinions reaffirm the Turner principle that prison regulations alleged to infringe upon constitutional rights need only be reasonably related to a legitimate penological interest. See, e.g., Kaufman v. McCaughtry, 419 F.3d 678, 683 (7th Cir. 2005); Tarpley, 312 F.3d at 898. To prevail in his free exercise

claim, Plaintiff must establish that a central religious belief or practice was "burdened in a significant way." Kaufman, 419 F.3d at 683.

At issue in this litigation is Plaintiff's inability to attend religious services from December 26, 2003, to May 26, 2004, at Pontiac Correctional Center. Plaintiff alleges this violated his First Amendment right to free exercise of his religion. Plaintiff does not associate with a specific denomination, but characterizes his religious beliefs as Christian. (Undisputed Material Fact No. 2.) Plaintiff received two disciplinary reports on December 26, 2003, charging him with damage or misuse of property, violation of rules, and disobeying a direct order. (Undisputed Material Fact Nos. 5-7.) Two separate hearings were held, one for each disciplinary report, and Plaintiff was found guilty of the charges, receiving disciplinary sanctions of 3 months in segregation and 2 months in segregation, respectively. (Undisputed Material Fact No. 8.) Thus, Plaintiff was confined in disciplinary segregation at Pontiac Correctional Center for disciplinary reasons from December 26, 2003, to May 26, 2004. (Undisputed Material Fact Nos. 5-9.) It is undisputed that during that time period of December 26, 2003, to May 26, 2004, Plaintiff and other inmates in disciplinary segregation at Pontiac Correctional Center were not afforded the opportunity to attend communal religious services. (Undisputed Material Fact No. 10, 14.)

Legitimate penological reasons exist for not permitting inmates in segregation status to attend communal religious services at Pontiac Correctional Center. Pontiac Correctional Center is a maximum-security facility for adult male felons. (Undisputed Material Fact No. 3.) Inmates at Pontiac are assigned to either disciplinary segregation status or protective custody status. (Undisputed Material Fact No. 4.) Inmates in disciplinary segregation status at Pontiac Correctional Center do not attend communal meals, spend recreational

8

time on the prison yard in a group, attend library services as a group, or attend communal religious services. (Undisputed Material Fact No. 10.) Inmates in disciplinary segregation status at Pontiac Correctional Center have been placed there for disciplinary reasons. (Undisputed Material Fact Nos. 11.) Those disciplinary reasons include engaging in behaviors that include assault, fighting, sexual misconduct, possession of contraband, and threats and intimidation. (Undisputed Material Fact No. 11.) Given this demonstrated propensity for adverse behavior, there are security concerns underlying the policy of not allowing inmates in disciplinary segregation status to attend communal activities. Specifically, staff cannot ensure the safety and protection of other staff members and of inmates if the inmates with disciplinary issues are allowed to congregate and participate in communal activities. (Undisputed Material Fact No. 12.) Those inmates may attempt to interact with inmates with whom the original disciplinary offenses occurred. (Undisputed Material Fact No. 12.) Communal activities, including religious services, also present a potential security concern because of the opportunity for gang-related activity. (Undisputed Material Fact No. 13.) Maintaining the safety and security of Pontiac Correctional Center, a maximum-security facility, is a legitimate penological interest.

In accordance with Turner, Plaintiff also had alternative means of exercising his religious beliefs. Individual religious counseling was made available to inmates in segregation status. (Undisputed Material Fact No. 15-17.) Plaintiff acknowledges that he saw Chaplain Kennell while in segregation. (Undisputed Material Fact No. 18.) Additionally, Chaplain Kennell or other religious volunteers tour the segregation living units at Pontiac Correctional Center at least once per week to speak with and provide religious counseling to segregation inmates. (Undisputed Material Fact No. 17.) Plaintiff was able

to pray in his cell and over his meals while in segregation status. (Undisputed Material Fact No. 19.) Plaintiff was permitted to have religious materials in his cell. (Undisputed Material Fact No. 20.) Specifically, while in segregation from December 26, 2003, to May 26, 2004, Plaintiff was able to read the Bible and religious publications including "The Daily Bread" and a daily prayer manual from the Gideons. (Undisputed Material Fact No. 20.) Thus, there were alternative means available to Plaintiff for the exercise of his religious beliefs, albeit on an individualized basis rather than in a group setting. Additionally, it is not clear that communal worship is central to the practice of Plaintiff's generalized religious beliefs. Furthermore, Defendants did not place any affirmative burdens on the practice of Plaintiff's religious beliefs. For these reasons, Defendants respectfully request this Honorable Court grant summary judgment for Defendants.

II. **DEFENDANTS HOWARD AND VELA CANNOT BE HELD LIABLE AS THEY LACK PERSONAL INVOLVEMENT IN THE ALLEGED CONSTITUTIONAL VIOLATIONS**

The doctrine of *respondeat superior* does not apply to actions pursuant to 42 U.S.C. § 1983. Chavez v. Illinois State Police, 251 F.3d 612, 651 (7th Cir. 2001). Hence, a supervisor must have personal involvement in the violation of a plaintiff's constitutional rights in order to be held liable. Id. Under § 1983, personal involvement means the supervisor "caused or participated in the alleged violation." Boyce v. Moore, 314 F.3d 884, 888 (7th Cir. 2002). A person's position as a supervisory official within the Department of Corrections is insufficient to support an inference of personal involvement in an alleged constitutional violation. Williams v. Faulkner, 837 F.2d 304, 308 (7th Cir. 1988). Mere awareness of an alleged violation does not make the official personally responsible. Crowder v. Lash, 687 F.2d 996, 1005-06 (7th Cir. 1982). Rather, a plaintiff must show

10

personal participation by the supervisor, or that the challenged actions occurred based on the supervisor's order or by the supervisor's consent. Id. at 1006. Where a supervisor's only involvement was to write a letter to the plaintiff explaining or justifying the subordinate's actions, this involvement was deemed insufficient to support a § 1983 claim against that supervisor. Kernats v. O'Sullivan, 35 F.3d 1171, 1182-83 (7th Cir. 1994). A plaintiff's allegations that he informed the defendant personally and by letter of the claimed constitutional violations do not constitute personal involvement sufficient to assert liability under § 1983. Crowder v. Lash, 687 F.2d 996, 1005-06 (7th Cir. 1982).

Here, the alleged violation of Plaintiff's constitutional rights is his lack of access to communal religious services at Pontiac Correctional Center from December 26, 2003, to May 26, 2004. Defendants Howard and Vela are implicated in Plaintiff's First Amendment claim only to the extent of their involvement on the Adjustment Committees that found Plaintiff guilty of the disciplinary charges. (Undisputed Material Fact Nos. 21-23.) Defendant Howard served as Chairperson of both Committees. (Undisputed Material Fact No. 21.) Defendant Vela served only on the Committee recommending disciplinary sanctions of three months in segregation. (Undisputed Material Fact No. 22.) There is no evidence that either Defendant Howard or Defendant Vela had any involvement in the decision whether inmates, including Plaintiff, would attend communal religious services while in disciplinary segregation status. Plaintiff admits he had no further interaction with either Defendant Howard or Defendant Vela after he was placed in disciplinary segregation. (Undisputed Material Fact No. 23.) Plaintiff's allegations are insufficient to impose liability upon Defendants Howard and Vela pursuant to 42 U.S.C. § 1983, as neither of these Defendants caused or participated in the alleged constitutional violations.

11

### III. TO THE EXTENT THESE ALLEGATIONS ARE BROUGHT AGAINST DEFENDANTS IN THEIR OFFICIAL CAPACITY, THE ELEVENTH AMENDMENT ACTS AS A BAR TO PLAINTIFF'S CLAIM FOR DAMAGES

The United States Supreme Court has established that damages cannot be recovered against a state official in that person's official capacity, as these judgments would necessarily be paid out of the state treasury and thus are barred by the Eleventh Amendment. Edelman v. Jordan, 415 U.S. 651, 664-65 (1974). A claim against a state employee in his or her official capacity rather than individual capacity is a suit against the state. Kentucky v. Graham, 473 U.S. 159, 165-66 (1985). Hence, suits against state employees acting in their official capacities are barred by the Eleventh Amendment and may not be brought without the state's consent. Seminole Tribe of Florida v. Florida, 517 U.S. 44, 54-55 (1996). This is true even if the state has not been named as a party to the action. Edelman, 415 U.S. at 663. Plaintiff's claim for injunctive relief is no longer at issue in this litigation. To the extent that Plaintiff seeks damages against Defendants in their official capacity, such claims are barred by the Eleventh Amendment and should be dismissed.

### IV. DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

Qualified immunity applies to government officials performing discretionary functions, shielding officials from liability for civil damages provided their conduct does not violate clearly established statutory or Constitutional rights. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The threshold question for qualified immunity is whether the facts alleged show the defendant violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001). The plaintiff has the burden of proving a clearly established right. Snyder v. Nolan, 380 F.3d 279, 290 (7th Cir. 2004). With respect to the alleged violation of First Amendment

rights, there must be closely analogous case law putting an official on notice that the balance of the competing individual and government interests he strikes is improper. Gregorich v. Lund, 54 F.3d 410, 415 (7th Cir. 1995). This qualified immunity standard protects "all but the plainly incompetent or those who knowingly violate the law." Id.

Plaintiff cannot meet his burden of proving a clearly established constitutional right in this matter. There is no closely analogous caselaw putting Defendants on notice that inmates in disciplinary segregation must be afforded the opportunity to attend communal religious services when there are institutional security concerns at stake. Consistent with O'Lone and Turner, there are legitimate penological interests in not allowing inmates assigned to segregation status for disciplinary reasons to attend communal services; additionally, Plaintiff had alternative means of exercising his religious beliefs, including praying in his cell and over his meals, and having access to religious volunteers and religious materials. (Undisputed Material Fact Nos. 15-20.) As Plaintiff cannot meet his threshold burden of demonstrating Defendants violated a constitutional right, Defendants should therefore be protected under the doctrine of qualified immunity.

## CONCLUSION

Plaintiff's First Amendment rights have not been violated, as legitimate penological reasons existed for not allowing inmates in disciplinary segregation to attend communal religious services and Plaintiff had alternative means of exercising his religious beliefs. Additionally, Defendants Howard and Vela cannot be held liable, as they lacked the requisite personal involvement in the alleged violation of Plaintiff's constitutional rights. To the extent Plaintiff asserts his claims against Defendants in their official capacity, the Eleventh Amendment bars these official capacity claims. Finally, Defendants are entitled

to qualified immunity, as there is no closely analogous caselaw putting them on notice that inmates in segregation for disciplinary reasons must be permitted to attend communal religious services. For these reasons, Defendants respectfully request this Honorable Court grant their Motion for Summary Judgment.

       Respectfully submitted,

       ROGER E. WALKER JR., ERIKA HOWARD, JENNIFER MELVIN, and CLIFFORD VELA,

          Defendants,

       LISA MADIGAN, Attorney General
State of Illinois,

          Attorney for Defendants,

       s/Carrie L. Kinsella
Carrie L. Kinsella, #6283318
Attorney for Defendant
Assistant Attorney General
500 South Second Street
Springfield, IL  62706
Telephone:  (217) 557-0261
Facsimile:  (217) 782-9059
ckinsella@atg.state.il.us

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2006, I electronically filed Memorandum of Law in Support of Defendants' Motion for Summary Judgment with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

None

and I hereby certify that on September 29, 2006, I mailed by United States Postal Service, the document to the following non-registered participant:

Kevin Carter, #R-25659
Pinckneyville Correctional Center
5835 State Route 154
PO Box 999
Pinckneyville, IL 62274

Respectfully submitted,
/s/Carrie L. Kinsella
Carrie L. Kinsella, #6283318
Attorney for Defendant
Assistant Attorney General
500 South Second Street
Springfield, IL  62706
Telephone:  (217) 557-0261
Facsimile:  (217) 524-5091
ckinsella@atg.state.il.us