1          IN THE UNITED STATES DISTRICT COURT
     FOR THE CENTRAL DISTRICT OF ILLINOIS

2

KEVEN L. CARTER,

3

Plaintiff,

4

vs.                    No. 04-1157

5

ERIKA R. HOWARD, CLIFFORD VELLA,

6

RICHARD ALLEN, DOUGLAS CRAVENS,
ROGER WALKER, JR.,

7

Defendants.

8

          DEPOSITION OF KEVEN CARTER

9

The deposition of **KEVEN CARTER**, a witness called

10    pursuant to notice at the instance of Defendants
taken on August 30, 2006, at 2:00 p.m., at

11    Pinckneyville Correctional Center, 5835 State Route
154, Pinckneyville, Illinois, before Sharon Valerius,

12    Notary Public and Certified Shorthand Reporter
#084-003349 for the State of Illinois.

13

          A P P E A R A N C E S

14

In behalf of the Defendants:

15         MS. CARRIE L. KINSELLA
     ASSISTANT ATTORNEY GENERAL

16         500 South Second
     Springfield, Illinois 62706

17

18

19

20

21

22

23

24

25

          SOUTHERN REPORTING
          (618) 997-8455



DEFENDANT'S
EXHIBIT
1

1                          I N D E X

                                                    PAGE

2    EXAMINATION
     Conducted by Ms. Kinsella                        3

3

4

5

6

7             REQUESTS FOR INFORMATION
                    (None made)

8

9

10

11

12                E X H I B I T S
                MARKED    IDENTIFIED    OFFERED

13   (None)

14

15

16

17

18

19

20

21

22

23

24

25

1    questions today?

2         A.   Well, I'm on psych. medicine right

3    now.  I'm taking Prozac.  I don't know.  I've only

4    been taking that a month now, so --

5         Q.   Does it affect your ability to answer

6    questions?

7         A.   I don't know.  Like I said, I've only

8    been taking it a month, so I haven't been suffering

9    no side effects, so the doctor says that's good.  So

10   I don't know.  I don't even know what it's for.  I

11   think it's mostly for depression.

12        Q.   Well, if you find something confusing,

13   please let me know, and I'll be glad to rephrase it.

14        A.   Okay.

15        Q.   How old were you when you first entered

16   the Illinois Department of Corrections?

17        A.   Umm, it was in 2002, so I was 36.

18        Q.   And what county were you convicted in?

19        A.   Winnebago County.

20        Q.   What were you convicted for?

21        A.   Attempted aggravated criminal sexual

22   assault.

23        Q.   You are currently housed at

24   Pinckneyville Correctional Center; right?

25        A.   That's correct.

13

```
 1   I get patted down and put in one of these jumpsuits.

 2   They put me in my cell.  I think my cell was 215 at

 3   that time.  It was a solid door and, uh, where it

 4   just had perforated holes in it where you could just

 5   see out.

 6              And, uh, when I got in my cell, I

 7   didn't have no towel or nothing or any toilet paper,

 8   so I asked the C/O for some toilet paper.  He kept on

 9   giving me the runaround, so I started banging on my

10   door.  Next thing you know, "Why are you banging on

11   the door?"  And next thing I know, I got another

12   ticket for banging on my door.  They charged me for

13   dis, uh, damage to state property or something like

14   that for banging on my door.

15              So next thing I know, I got disobeying

16   a direct order, refusing housing, and banging on my

17   door.  So, uh, you want me to go to the disciplinary

18   hearing they had on my tickets?

19         Q.   Uh --

20         A.   Or am I jumping ahead?

21         Q.   Well, I guess, just to make sure I

22   understand, there were two disciplinary tickets on

23   December 26, 2003; is that correct?

24         A.   Well, there was actually three,

25   disobeying a direct order, refusing housing, and
```

1     then, uh, damage or misuse of state property, and

2     violation -- well, there's actually four.  Violation

3     of, uh, uh, of rules, uh, banging on the door,

4     excessive noise or something like that.  I can't

5     remember what the --

6                Q.   So there were four charges, but I think

7     they were written up on two separate documents; is

8     that right?

9                A.   Yeah.

10               Q.   And the adjustment committee that heard

11    those tickets imposed disciplinary sanctions upon

12    you; right?

13               A.   Yeah.  The first time on, uh, the

14    disobeying a direct order, or not disobeying a direct

15    order, but, uh, the damage to state property.

16               Q.   Uh-huh.

17               A.   And, uh, the violation of noise they

18    heard on January 1, 2004, or yeah, 2004, where they

19    gave me, I think, 60 days or something like that.  I

20    can't remember.  And then they gave the rewrite for

21    the next week on January 9, because Sylvia Stamm or

22    whatever, the officer, had to rewrite the ticket,

23    'cause she didn't write the ticket right.

24                     So she got me for refusing housing and

25    disobeying a direct order, that ticket.  And then I

15

1    think I got another 60 days or something like that.

2    I can't remember.   I did total five months in seg for

3    the two charges or tickets, total of four charges.

4            Q.    See if this sounds correct to you.

5    There was a hearing on January 1 of 2004 where you

6    were charged with damage or misuse of property,

7    insolence, and violation of rules, and the

8    disciplinary action taken included three months

9    segregation.

10            A.    Yeah, that's it.

11            Q.    Okay.

12            A.    Yeah, that's it.

13            Q.    And then there was a second ticket that

14    was heard on January 8 of 2004 for disobeying a

15    direct order, refusing housing?

16            A.    Yeah.   That's the rewrite ticket I was

17    telling you.

18            Q.    Okay.   And the disciplinary measures

19    imposed on that were two months in segregation.   Does

20    that sound right?

21            A.    Yeah, that sounds right.   So I think I

22    did a total of five months.

23            Q.    And all five months were disciplinary

24    measures for charges that were brought against you;

25    is that correct?

SOUTHERN REPORTING
(618) 997-8455

        Q.    The claimed issue in this case is a
First Amendment claim regarding access to religious
services.  Let's talk a little bit about your faith.
What faith do you practice, Mr. Carter?

        A.    Well, right now I just consider myself
a Christian, because I don't have no really faith I
go by.  You know, I usually go to like a
non-denominational church.  I was raised in that.  So
it's like, you know, I never really got into -- but
it's hard for me to understand my Bible studies and
stuff like that, you know.  It's easier for me to be
in a group setting, where I can understand the Bible
verses and stuff.  And then when I was in seg, I
couldn't do that, 'cause I couldn't go to church
services.  That's what my complaint was about.

        Q.    And the time period that we're talking
about is December, late December 2003 and the
beginning of 2004.

        A.    It was December 2003 till May --

        Q.    2004?

        A.    -- 2004, when I got out of seg, yes.

        Q.    Okay.  So at that time, what was your
faith?

        A.    It was mostly, like I said, Christian,
you know.  It's just that I believed in, you know,

                    SOUTHERN REPORTING
                      (618) 997-8455

1    around.

2              Q.    So that time period from December 26,

3    2003, to May 26, 2004, you did not attend any

4    communal religious services during that time?

5              A.    No.

6              Q.    Did you attend any religious services

7    at all?

8              A.    No.  Only thing I had access to was the

9    chaplain, Chaplain Kennell or whatever you said his

10   name was.

11             Q.    And no one in seg attends religious

12   services; right?

13             A.    See, that's -- with me being locked up

14   in seg, I couldn't -- I didn't even -- I was

15   surprised the judge even accepted my First Amendment

16   claim, 'cause I didn't even know I had one, to be

17   honest about it.

18             Q.    Let's talk a little bit about some

19   specifics about Pontiac Correctional Center.  Pontiac

20   is a maximum security facility; correct?

21             A.    Yes.

22             Q.    And the allegations in your complaint

23   relate solely to Pontiac; right?

24             A.    Yes.

25             Q.    And inmates may be placed in

SOUTHERN REPORTING
(618) 997-8455

26

1    around.

2        Q.    So that time period from December 26,

3    2003, to May 26, 2004, you did not attend any

4    communal religious services during that time?

5        A.    No.

6        Q.    Did you attend any religious services

7    at all?

8        A.    No.  Only thing I had access to was the

9    chaplain, Chaplain Kennell or whatever you said his

10   name was.

11       Q.    And no one in seg attends religious

12   services; right?

13       A.    See, that's -- with me being locked up

14   in seg, I couldn't -- I didn't even -- I was

15   surprised the judge even accepted my First Amendment

16   claim, 'cause I didn't even know I had one, to be

17   honest about it.

18       Q.    Let's talk a little bit about some

19   specifics about Pontiac Correctional Center.  Pontiac

20   is a maximum security facility; correct?

21       A.    Yes.

22       Q.    And the allegations in your complaint

23   relate solely to Pontiac; right?

24       A.    Yes.

25       Q.    And inmates may be placed in

21

Q.    Did you meet on an individual basis
with any religious persons while you were in
segregation at Pontiac?

A.    No.  The only one that was allowed to
come by was, uh, the chaplain, you know, that come to
my cell.  Other than that, like that friend I was
telling you about that took me to that shelter, it
was too far for him to drive to come and see me.  But
I could've had pastor visits or something like that,
but my pastor at that church, like I said, it was too
far for him to drive, so I didn't even have no family
visits at the time.

So it's like the chaplain and the Bible
studies.  But, uh, but I guess I'm answering that
right.  The chaplain -- I could've had the chaplain
visits, you know, if the chaplain would've came.  The
way I understand it, I could've had like maybe one or
two visits a week.  The chaplains, if I had like a
pastor visit or something like that, that didn't
count like one of my visits, but I didn't know how
often the rules were, because it took me until almost
the end of April before I got what they call the seg
orientation manual.

And I finally got that after I got a
ticket for, umm -- I don't know if I'm getting off in

SOUTHERN REPORTING
(618) 997-8455

1   around.

2           Q.    So that time period from December 26,

3   2003, to May 26, 2004, you did not attend any

4   communal religious services during that time?

5           A.    No.

6           Q.    Did you attend any religious services

7   at all?

8           A.    No.  Only thing I had access to was the

9   chaplain, Chaplain Kennell or whatever you said his

10  name was.

11          Q.    And no one in seg attends religious

12  services; right?

13          A.    See, that's -- with me being locked up

14  in seg, I couldn't -- I didn't even -- I was

15  surprised the judge even accepted my First Amendment

16  claim, 'cause I didn't even know I had one, to be

17  honest about it.

18          Q.    Let's talk a little bit about some

19  specifics about Pontiac Correctional Center.  Pontiac

20  is a maximum security facility; correct?

21          A.    Yes.

22          Q.    And the allegations in your complaint

23  relate solely to Pontiac; right?

24          A.    Yes.

25          Q.    And inmates may be placed in

1          A.    Yeah.

2          Q.    Okay.    What cell were you at during

3    your time period in segregation?

4          A.    I was in west cellhouse.    I was first

5    housed in 215, and then I got moved to 210, which is

6    behind, what they call behind the bars, open bars

7    where you can reach out and stuff.    They usually put

8    you behind a solid door for like the first 60 days

9    and see how you adjust, and then you can write to the

10   lieutenant, and then they'll move you.

11         Q.    And in segregation, you do not have a

12   cellmate; is that correct?

13         A.    No.    They were single-man cells.

14         Q.    Okay.

15         A.    I'm sure they got different cells in

16   other cellhouses, but I was in a single-man cell --

17         Q.    Okay.

18         A.    -- I think mostly because of my

19   conviction and then me being in protective custody at

20   the time.

21         Q.    Let's talk about the religious

22   activities you could engage in while you were in

23   segregation.    Could you pray in your cell?

24         A.    Yeah.

25         Q.    Could you pray over your meals?

SOUTHERN REPORTING
(618) 997-8455

A.    Yeah.

Q.    Could you read "The Daily Bread"?

A.    No, because sometimes I didn't have one.  I had to wait for the chaplain to send them.  Sometimes they'd take a month before I'd get it.  But then I eventually did get them afterwards, after you request, and you have to send a request, what you call a request form, send it to the chaplain, and then he, when he gets a chance, he sends it to the institution, 'cause like he sent me a King James Bible he thought would help me, too.  But that took like two months before I got that.

Q.    But while you were in seg, could you read the Bible?

A.    I could, but I couldn't understand it.  It was, it was -- that's why I was, I was going to Bible studies.  It was easier for me to understand when somebody does the Bible studies and preaches it to me, and then if I have a question or something, I can ask it, instead of just having me sitting there and read it, 'cause I got a reading problem.  I had a learning disability in high school and stuff and throughout my whole schooling, where I had difficulty comprehending what I read.

So it was kind of hard for me to

1    A.    Yeah.

2    Q.    Could you read "The Daily Bread"?

3    A.    No, because sometimes I didn't have

4    one.  I had to wait for the chaplain to send them.

5    Sometimes they'd take a month before I'd get it.  But

6    then I eventually did get them afterwards, after you

7    request, and you have to send a request, what you

8    call a request form, send it to the chaplain, and

9    then he, when he gets a chance, he sends it to the

10   institution, 'cause like he sent me a King James

11   Bible he thought would help me, too.  But that took

12   like two months before I got that.

13   Q.    But while you were in seg, could you

14   read the Bible?

15   A.    I could, but I couldn't understand it.

16   It was, it was -- that's why I was, I was going to

17   Bible studies.  It was easier for me to understand

18   when somebody does the Bible studies and preaches it

19   to me, and then if I have a question or something, I

20   can ask it, instead of just having me sitting there

21   and read it, 'cause I got a reading problem.  I had a

22   learning disability in high school and stuff and

23   throughout my whole schooling, where I had difficulty

24   comprehending what I read.

25   So it was kind of hard for me to

SOUTHERN REPORTING
(618) 997-8455

1       A.    No, because in segregation, you're in C

2   grade, and you can't use the phone.

3       Q.    Okay.  So for disciplinary reasons, you

4   couldn't use the phone?

5       A.    No.

6       Q.    Is that correct?

7       A.    Oh, yeah.

8       Q.    Were you permitted to have religious

9   materials in your cell while you were in seg?

10      A.    Yeah, but it had to go through the

11  chaplain, and it took a while to get it.  Like I

12  said, it took almost two months before I got my King

13  James Bible.  He thought that would help me

14  understand.  'Cause I stopped him one time.  He would

15  come like maybe once a month, and he'll come around

16  and pass out these, uh, I can't think of what they're

17  called, the Salvation Army, uh, I can't think of what

18  they're called.  They're Salvation Army magazines.

19      Q.    Okay.

20      A.    And he would pass those out.  And I

21  stopped and I asked him one time about, uh, having

22  difficulty reading the Bible I had.  And we got into

23  conversation a little bit.  And he said, he suggested

24  to try a King James Bible, "It might help you to

25  understand a lot better," since I was in seg, you

SOUTHERN REPORTING
(618) 997-8455

know, and 'cause I have a New International Version.
I don't know if you understand what that is.

          But it's harder for me to understand
without being like in a group thing.  And the King
James is supposed to be helpful.  But even with the
King James, I have problems understanding some of the
verses and stuff like that.

          Q.   Did you have any other religious
materials in your cell while you were in seg?

          A.   Just "The Daily Bread," and then, oh, I
had the chaplain from my county jail, I finally got a
letter to him.  It took about three months to get
it.  He sent me this prayer thing that we use in the
county jail.  It was called, uh, called a daily
prayer.  It is from the Gideons.  I don't know if you
know what that is.  But it's a daily prayer thing
where I was supposed to pray.  It was supposed to
help me pray every day.  And then I did that for
every day.  That's what I was trying to tell you with
the prayer part with the meals and stuff like that,
'cause it would help you, before I went to bed and
then when I woke up.  It was like two separate prayer
things, one in the morning and one at night.  I did
that from probably April until the end of, uh, my
segregation time when I got that.

                    SOUTHERN REPORTING
                     (618) 997-8455

32

you were actually grieving the disciplinary tickets
that you received; right?

     A.    Yeah.  And plus the religious part.

     Q.    Do you have any other allegations
against Director Walker?

     A.    Just the claims that Judge Baker, uh,
dismissed.

     Q.    Okay.  So things that are no longer in
this litigation; is that correct?

     A.    Yeah.

     Q.    Let's talk about Erika Howard.  How are
you alleging Ms. Howard violated your First Amendment
rights?

     A.    She was the chairperson of the
adjustment committee.  I just feel that she wasn't
impartial on her, uh -- I don't know what the word is
-- on her fact finding, I guess when she found me
guilty on both those hearings.

     Q.    Okay.  How did she -- how was she
involved in you not going to religious services?

     A.    By finding me guilty, placing me in
seg, and, uh, I don't know.  See, I can't really -- I
didn't know, see, the way, uh, to investigate all
this on the religious part.  That's why I'm --

     Q.    Do you know who decides whether or not

1          Q.    Okay.   After Ms. Howard and Mr. Vella

2     served on that adjustment committee, did you have any

3     interaction with them while you were in segregation?

4          A.    No.

5          Q.    Okay.   And again, don't get

6     frustrated.   All we're trying to do is talk about the

7     facts here, so --

8          A.    I'm just trying to, you know -- I don't

9     understand.   That's what I was trying to tell you

10    before we started about, uh, this, you know.   I

11    didn't even get a chance to investigate it.   I don't

12    know how to investigate a First Amendment claim.   I

13    mean, I got two other civil complaints.   I got

14    attorneys appointed on those, you know, so I'm

15    just --

16         Q.    And again, you don't have to know

17    everything about the law.   You just need to know the

18    facts, what involvement these people had in your

19    practice of your religion.   So for example, if Ms.

20    Howard ever came up to your cell, took your Bible

21    away and said, "You can't read your Bible anymore,"

22    that would be a fact relevant to this.

23         A.    Oh, I see what you're getting to.   No,

24    I can't say that, no.

25         Q.    Okay.   So once you went into

1    no.

2            Q.    Okay.

3            A.    I just feel that there should have been

4    some kind of like the way with exercise, should have

5    been, like there should have been some kind of way

6    where I could've been able to attend my religious

7    services.  I couldn't get in to research, so I can't

8    really say yes or no on that.

9            Q.    Okay.  That's fine.  Let's talk about

10   Director Walker.  How are you alleging Director

11   Walker violated your First Amendment rights?

12           A.    Well, there's another problem, see.  I

13   understand he's the director of, uh, the Illinois

14   Department of Corrections, and he's the one that is

15   over all the employees of the Department of

16   Corrections.

17           Q.    Uh-huh.

18           A.    And he's responsible for, uh, the rules

19   and regulations and all that.  So, umm, I can't

20   really pinpoint -- I know that the requirement since

21   1983 is I gotta' point to official policy or

22   something to show how he's responsible, and I can't,

23   I can't get into the law library to pick --

24           Q.    And that's fine.  What I'm asking

25   you is --

1          Q.    Okay.   So you filed a grievance?

2          A.    Yes.

3          Q.    And so explain to me how he is then

4    responsible.

5          A.    Well, the grievance procedure -- can I

6    get into that?

7          Q.    Yeah, that's fine, absolutely.

8          A.    Grievance procedure requires an inmate

9    to resolve all grievances that are not disciplinary,

10   but, uh, umm, I can't -- I don't know the word for

11   it.   But usually you gotta' go through routes.   You

12   gotta' go through the counselor.   There's steps.   And

13   it's like a disciplinary thing.   You go like with my

14   tickets, four tickets, my two tickets, I had to

15   grieve on that strictly to the grievance officer.

16   And then I had to wait for the grievance officer to

17   respond, which he denied it.

18         Q.    Who was the grievance officer?

19         A.    I can't remember.   I just added her as

20   a --

21         Q.    Jennifer Melvin?   Is that --

22         A.    Yeah, that's the one that signed off on

23   the grievance.

24         Q.    So you filed a grievance.   What did

25   that grievance say?

31

1          A.   The grievance, without even looking at

2     it, I was complaining about not being able to attend

3     religious services.  Uh, it said something about the

4     exercise, I think.  I'm not sure.

5          Q.   It was a fairly long grievance, wasn't

6     it, maybe like 15 pages or something?

7          A.   Yeah.  It was mostly written on paper.

8     I didn't know I had to use a special grievance form.

9     But somehow the grievance form was accepted.  I used

10    the regular grievance form, and then -- but anyway,

11    she denied it.  So I had 30 days after the warden

12    signed off on it to appeal to the Administrative

13    Review Board, and that's at Springfield.

14         Q.   Uh-huh.

15         A.   So when I got their decision, they

16    denied it, said that, uh, there was no basis for what

17    they call a formal hearing, so they denied it.  So

18    then my next step was to file a civil complaint.

19         Q.   Do you know whether Director Walker

20    personally reviewed your grievance appeal?

21         A.   He signed off on it.  Umm, I can't

22    really say yes or no, but his signature was on --

23    maybe somebody puts his signature on there.  I don't

24    know if he personally read it.

25         Q.   Now, that grievance, in that grievance,

1

2

3

4   STATE OF ILLINOIS      )
                           ) SS
5   COUNTY OF JACKSON       )

6

7

8        I, Sharon Valerius, a Notary Public in and for
    the County of Jackson, State of Illinois, do hereby
    certify:
9        That the witness in the foregoing deposition was
    present at the time and place therein stated;
10       That the said proceeding was taken before me as
    a Notary Public at the said time and place and was
11   taken down in shorthand writing by me;
         That I am a Certified Shorthand Reporter of the
12   State of Illinois, that the said proceeding was
    thereafter under my direction transcribed into
13   computer-assisted transcription, and that the
    foregoing transcript constitutes a full, true, and
14   correct report of the proceedings which then and
    there took place;
15       IN WITNESS WHEREOF, I have hereunto subscribed
    my hand and affixed my official seal this 6th day of
16   September, 2006.

17

18

19                       s/Sharon Valerius

20

21   ------------------------------------------
     Sharon Valerius, Notary Public
22   In and for the County of Jackson
     State of Illinois

23

24              OFFICIAL SEAL
               SHARON VALERIUS
25        Notary Public – State of Illinois
          My Commission Expires 07/07/10

                    SOUTHERN REPORTING
                     (618) 997-8455